IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

DERRICK ZAPPO STEELE          )
                              )
v.                            )        No. 2:12-0042
                              )
CAROLYN W. COLVIN,            )
        Acting Commissioner of )
        Social Security[1]      )

To: The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income ("SSI"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No. 15) should be DENIED.

## I. INTRODUCTION

On March 27, 2008, the plaintiff protectively filed for SSI, alleging a disability onset date

of July 1, 1998,[2] due to bipolar disorder and depression. (Tr. 18, 102-07, 118, 138.) His application

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this case.

[2] The plaintiff filed for SSI, which does not provide for retroactive payments. *See* Soc. Sec. Rul. 83-20, 1983 WL 31249, at *7-8. Consequently, the ALJ correctly analyzed whether the plaintiff

was denied initially and upon reconsideration. (Tr. 55-60, 64-65.) On February 19, 2010, the plaintiff appeared and testified at a hearing before Administrative Law Judge Frank Letchworth ("ALJ"). (Tr. 32-54.) The ALJ entered an unfavorable decision on April 8, 2010. (Tr. 18-28.) On April 5, 2012, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. BACKGROUND

The plaintiff was born on November 13, 1973, and he was 24 years old as of his alleged disability onset date. (Tr. 138.) He attended special education classes through the ninth grade and has worked as a landscaper and assembler. (Tr. 36, 38-40, 47, 52, 192-206.)

### A. Chronological Background: Procedural Developments and Medical Records

### 1. Medical Records[3]

The plaintiff received mental health treatment at Plateau Mental Health Center ("Plateau")[4] beginning in June 1999, when he presented with complaints of depressed mood, anxiety, appetite loss, fatigue, loss of concentration, irritability, sleep disturbance, and visual and auditory

---

was disabled on or after his application date. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

[3] Because the plaintiff has not raised any issues regarding the ALJ's assessment of his physical impairments, the Court will focus its review of the medical evidence on the plaintiff's asserted mental impairments.

[4] Plateau is part of the Volunteer Behavioral Health Care System ("Volunteer"). Some of the plaintiff's medical records are denoted as originating with Volunteer and some with Plateau. The ALJ referred to both entities as Plateau, and the Court will do the same.

hallucinations.  (Tr. 223-24.)  At his initial assessment in 1999, he was assigned a Global Assessment of Functioning ("GAF") score of 50 and diagnosed with depressive disorder, not otherwise specified ("NOS"), generalized anxiety disorder, opioid dependence in remission, hallucinogen dependence in remission, and alcohol dependence in remission.[5]  (Tr. 224.)

The record does not contain any further medical records until January 2006, when the plaintiff presented to Dr. Angela Moss, whom he would continue to visit until November 2009. (Tr. 254-94.)  Dr. Moss treated the plaintiff primarily for anxiety, headaches, and sleeplessness, prescribing Maxalt for headaches and Valium and Xanax for anxiety.  *Id.*

In October 2007, the plaintiff returned to Plateau, where he was assigned a GAF score of 50 and diagnosed with bipolar I disorder, most recent episode depressed, severe with psychotic features; generalized anxiety disorder; and polysubstance dependence.  (Tr. 222.)  The plaintiff continued to receive mental health treatment at Plateau from 2008 to 2010.  (Tr. 214-22, 248-53, 295-315.)  For much of the plaintiff's treatment period at Plateau, his diagnoses and GAF scores remained unchanged, and he was treated with Depakote ER, Risperdal, Trazodone, and Celexa.[6]  (Tr. 217,

_____

[5] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM–IV–TR").  A GAF score between 41 and 50 falls within the range of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[6] Depakote ER is an anticonvulsant used to treat seizures, migraine headaches, and manic episodes of bipolar disorder.  Saunders Pharmaceutical Word Book 210 (2009) ("Saunders"). Risperdal is an antipsychotic used to treat schizophrenia, manic episodes of bipolar disorder, pediatric behavioral problems, autism, obsessive-compulsive disorder, and Tourette syndrome. *Id.* at 617-18.  Trazodone is an antidepressant used to treat aggressive behavior, alcoholism, panic disorder, agoraphobia, and cocaine withdrawal. *Id.* at 716.  Celexa is a selective serotonin reuptake inhibitor ("SSRI") used to treat major depression, obsessive-compulsive disorder, post-traumatic stress disorder, and generalized anxiety disorder. *Id.* at 142-43.

220-21, 249-50, 252-53, 297-98, 300, 302.) Treatment notes indicate that he frequently missed scheduled appointments. (Tr. 215, 217, 219, 248, 301-02, 306-09.)

In October 2008, the plaintiff reported that he was "doing better . . . and ha[d] been compliant with meds" and that he was "sleeping well," had "[n]o current mood or thought disorder," and "no other complaints." (Tr. 251.) A Tennessee Clinically Related Group ("CRG") form was completed in which the plaintiff was assigned a GAF score of 50 and assessed with moderate limitations in the areas of activities of daily living, interpersonal functioning, adaptation to change, and concentration, task performance, and pace. (Tr. 303-05.) In March 2009, the plaintiff reported that he could not work "because he can't deal with people and no one will hire him due to [his] criminal record [and] 4th grade education." (Tr. 296.) In May 2009, he reported that his "meds [were] helping him remain stable" and that he had been "attend[ing] ball games with [his] children," sleeping well, and not experiencing depression, anxiety, mood swings, or paranoia. (Tr. 299.) In September 2009, it was noted that the plaintiff had been noncompliant with scheduled appointments, and the plaintiff reported that he was unable to work "due to poor social skills." (Tr. 301-02.)

In January 2010, the plaintiff reported that he was stable, compliant with medication, and experiencing no side effects. (Tr. 310.) He said that his mood, anxiety, and psychosis were "well controlled" and that he was pursuing therapy for "chronic mental illness." *Id.* He was diagnosed with bipolar I disorder, most recent episode unspecified, generalized anxiety disorder, and polysubstance dependence, and he was assigned a GAF score of 55.[7] (Tr. 311.) In a treatment note the nurse practitioner "still question[ed] malingering for disability" but "suppose[d] he wouldn't be

[7] A GAF score between 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

a good candidate for work" because of his reports that "noone will hire him" and because "he has poor communication skills." *Id.* A CRG assessment completed the same day by another Plateau staff member found that he had mild difficulties in concentration, task performance, and pace and moderate difficulties in the areas of activities of daily living, interpersonal functioning, and adaptation to change. (Tr. 313-15.)

### 2. Opinion Evidence

On July 3, 2008, Jeffrey Scott Herman, MA, a DDS psychological consultant, evaluated the plaintiff, who reported that he heard voices, was illiterate, and had a history of drug and alcohol abuse. (Tr. 208-12.) The plaintiff said that he had received mental health treatment at Plateau since he was eighteen years old and that he was currently taking Citalopram as a "mood stabilizer" and Xanax for "bad anxiety." (Tr. 209.) The plaintiff reported that his daily activities included watching television, spending time with his children and girlfriend, visiting friends, and doing chores such as washing dishes and cooking. (Tr. 210.) During a mental status examination, Mr. Herman found that the plaintiff was "able to concentrate reasonably well" and had intact judgment, orientation, and long-term memory. (Tr. 210-11.) Mr. Herman found that the plaintiff was able to "clearly understand and remember instructions of a simple or detailed nature," sustain concentration and persistence, and communicate "reasonabl[y] well" despite his lack of education and literacy. (Tr. 211.) He noted that the plaintiff was able to travel independently via his bicycle and was able to set goals for himself. (Tr. 211-12.) Mr. Herman did note that the plaintiff's appearance was "very disheveled" and opined that "this could interfere with his ability to secure and hold employment." (Tr. 211.) He also found that the plaintiff's intellectual functioning was in the borderline-to-low-

average range; however, he "did not find any mental-status features that would interfere with the [plaintiff's] ability to hold employment." (Tr. 211-12.) Mr. Herman diagnosed the plaintiff with opioid dependence but was unable to assign a GAF score due to "[i]nadequate information." (Tr. 211.)

On July 24, 2008, Dr. Karen Lawrence, Ph.D., a DDS nonexamining psychological consultant, completed a Psychiatric Review Technique ("PRT") and mental Residual Functional Capacity ("RFC") assessment. (Tr. 229-46.) In the PRT, Dr. Lawrence found that the plaintiff had bipolar disorder, generalized anxiety disorder, and opiate dependence in reported remission (tr. 232, 234, 237), and she opined that he had moderate limitations performing the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace with no extended episodes of decompensation. (Tr. 239.) In the mental RFC assessment, Dr. Lawrence opined that the plaintiff was markedly limited in his ability to interact appropriately with the general public and moderately limited in several areas related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 243-44.) She explained that he was able to "perform simple and low level detailed tasks with normal supervision" and had the necessary concentration and persistence to perform such tasks. (Tr. 245.) She also explained that, with some difficulty, he was able to "relate adequately to co-workers [and] supervisors" and to "maintain acceptable behavior" but that he "should not work with [the] public" and should avoid hazards. *Id.*

On February 5, 2010, the plaintiff was psychologically evaluated by Dr. Roy Bilbrey, Ph.D. (Tr. 316-25.) The plaintiff reported that he had a history of alcohol and drug dependence and had suffered from depression since age 18. (Tr. 317.) He told Dr. Bilbrey that he was able to wash laundry, prepare sandwiches for lunch, go grocery shopping with other people, go to a drive-in movie

theater or restaurant with his girlfriend, feed the dog, watch television, and visit family members. (Tr. 318.) He said that he had few friends, no hobbies, and had difficulty dealing with people. *Id.*

Dr. Bilbrey found that the plaintiff did not have difficulty maintaining concentration throughout the evaluation, focusing, or completing tasks. *Id.* He opined that the plaintiff was "capable of relating to others and interacting and communicating effectively with them" and that his "judgment and reasoning abilities [were] adequate" for managing money. (Tr. 319.) He found that the plaintiff's reading ability was at the second grade level and that he was functionally illiterate but that a diagnosis of bipolar disorder was not warranted by the plaintiff's symptomatology. (Tr. 319-20.) He assigned the plaintiff a GAF score of 58 and diagnosed him with major depressive disorder, single episode, moderate; generalized anxiety disorder; polysubstance dependence, in full remission; reading disorder; and borderline intellectual functioning. (Tr. 320.)

Dr. Bilbrey completed a medical assessment of the plaintiff's mental ability to do work-related activities,[8] opining that the plaintiff had a good ability to follow work rules, use judgment, maintain attention and concentration, maintain personal appearance, demonstrate reliability, and understand, remember, and carry out simple job instructions. (Tr. 326-27.) He also opined that the plaintiff had a fair ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, behave in an emotionally stable manner, relate predictably in social situations, and understand, remember, and carry out detailed, but not complex, job instructions. *Id.* Finally, Dr. Bilbrey opined that the plaintiff had poor-to-no ability to understand, remember, and carry out complex job instructions. (Tr. 327.)

---

[8] The form that Dr. Bilbrey used defined "good" as "satisfactory," "fair" as "seriously limited, but not precluded," and "poor/none" as "[n]o useful ability to function in this area." (Tr. 326.)

**B. Hearing Testimony**

At the hearing on February 19, 2010, the plaintiff was represented by counsel, and the plaintiff and Katherine Bradford, a vocational expert ("VE"), testified. (Tr. 32-54.) The plaintiff testified that he is single, lives with his brother, and has two children, who both live with their mother. (Tr. 35-36.) He testified that he completed the ninth grade while taking special education classes and that he was incarcerated from October 2007 until February 2008 for driving under the influence ("DUI"). (Tr. 36, 46-47.)

The plaintiff testified that he is unable to work due to depression, anxiety, and bipolar disorder, adding that he would be physically able to work were it not for his mental impairments. (Tr. 44-45.) He testified that it had "been a few years" since he last worked and that he was "let go" from his last job "stacking books" at a factory because of his "poor communication skills." (Tr. 38, 47.) He added that he had not been able to keep up with the work and that it is "hard for [him] to deal with people . . . because of [his] disease." (Tr. 47.) He testified that he worked as a self-employed landscaper but stopped because he "couldn't keep work" and because he lost his driver's license following a DUI conviction. (Tr. 38-40.) He said that he "might be able to" return to work as a landscaper if he had transportation available. (Tr. 40.) He testified that he also worked at an automobile sun visor manufacturer but that he was fired for "[m]issing work," which he said was due to "dealing with [his] depression and all . . . [his] afflictions." (Tr. 40-41.)

The plaintiff testified that he takes Xanax for anxiety, Maxalt for headaches, and Tramadol for pain from a broken thumb. (Tr. 41-42.) He said that he also takes medication to help him sleep, adding that he sleeps 5-6 hours a night. (Tr. 48.) He testified that he does not experience any side effects from his medications and that he has not used illegal drugs or alcohol in approximately two

years. (Tr. 46, 48.) He related that, when he is depressed, he "stay[s] so down," he "can't deal with people," and he has a hard time understanding things. (Tr. 46-47.) He said that, since he stopped drinking alcohol, his depression has gotten worse but that he is able to "halfway function" if he takes his medication. (Tr. 49.) He explained that, on a good day, he is able to go to his son's ball games but that, on a bad day, he isolates himself, "stay[s] in [his] room all day and won't . . . associate with [anyone]." *Id.* He estimated that he has 3-4 good days a week and that the rest are bad days. *Id.* He testified that he has "real bad memory loss," that he often forgets appointments and dates, and that he has problems concentrating, following through, and finishing tasks. (Tr. 50.)

The VE testified that her testimony was consistent with the Dictionary of Occupational Titles and classified the plaintiff's past job as a landscaper as medium and unskilled and his past job as an assembler as light and unskilled. (Tr. 52, 54.) The ALJ asked the VE whether a hypothetical person with the plaintiff's age, education, and work experience was capable of working at any exertional level if he needed simple instructions and supervision that was direct and non-confrontational, could have no interaction with the general public, could have occasional and casual interaction with coworkers or supervisors, could adapt to occasional changes in work settings or routines, could not perform highly stressful activities involving production rate or quota based jobs, and could read at a second grade level. (Tr. 52.) The VE testified that such a person could not perform the plaintiff's past relevant work but could work in representative jobs at the medium, unskilled level such as occupational cleaner, production laborer, and machine tender. (Tr. 52-53.)

Next, the ALJ asked whether there would still be jobs available if a person with these limitations was also "seriously limited but not precluded" in the areas of relating to coworkers,

dealing with the public, interacting with supervisors, dealing with job stress, and functioning independently. (Tr. 53.) The VE replied that such a person would be precluded from all work. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on April 8, 2010. (Tr. 18-28.) Based upon the record, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since March 27, 2008, the application date (20 CFR 416.971 *et seq.*).

\*\*\*

2. The claimant has the following severe impairments: depressive disorder, generalized anxiety disorder, polysubstance and alcohol dependence in reported remission, and possible borderline intellectual functioning (20 CFR 416.920(c)).

\*\*\*

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

\*\*\*

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to the performance of tasks with simple instructions. The claimant requires direct supervision that is non-confrontational and is restricted from jobs that require contact with the general public. The claimant is capable of occasional and casual interaction with coworkers and supervisors and is capable of adapting to occasional changes in the work setting or routine. The claimant is further restricted to positions that are not highly stressful and have no production rates and no quotas and furthermore should be limited to tasks that require no more than 2nd grade reading skills.

\*\*\*

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

\*\*\*

6.      The claimant was born on November 13, 1973 and was 34 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant is illiterate and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

***

10.     The claimant has not been under a disability, as defined in the Social Security Act, since March 27, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 20-28.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion.  42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d

399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful

activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. § 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. § 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. § 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a

showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his past relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. 20 C.F.R. § 416.912(f); 68 Fed. Reg. 51153, 51154-55 (Aug. 6, 2003). *See also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national

economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 416.920(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The Five-Step Inquiry**

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one the ALJ found that the plaintiff had not engaged in substantial gainful activity since his application date. (Tr. 20.) At step two the ALJ determined that the plaintiff had the following severe impairments: "depressive disorder, generalized anxiety disorder, polysubstance and alcohol dependence in reported remission, and possible borderline intellectual functioning." *Id.* At step three the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20-22.) At step four, the ALJ determined that the plaintiff was unable to perform his past relevant work. (Tr. 27.) At step five, the ALJ found that the plaintiff could perform representative jobs at the medium, unskilled exertional level as a "cleaner general," production laborer, and machine tender. (Tr. 27-28.)

## C. The Plaintiff's Assertion of Error

The plaintiff raises one issue, arguing that the ALJ "erred in rejecting the opinion of . . . Dr. Roy Bilbrey and the reports from [the plaintiff's] treating psychologists at Plateau . . . ." Docket Entry No. 16, at 12.

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 416.927(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[8] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

---

[8] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a).

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[9] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R.

---

[9] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

§§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[10] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

Dr. Bilbrey psychologically evaluated the plaintiff in February 2010 and completed a medical assessment of the plaintiff's mental ability to do work-related activities. (Tr. 316-28.) He opined that the plaintiff had a "good" ability to follow work rules, use judgment, maintain attention and concentration, and understand, remember, and carry out simple job instructions. (Tr. 326-27.) He opined that the plaintiff had a "fair" ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, behave in an emotionally stable manner, relate predictably in social situations, and understand, remember, and carry out detailed, but not complex, job instructions. *Id.* Most significantly, he opined that the plaintiff had poor-to-no ability to understand, remember, and carry out complex instructions. (Tr. 327.)

Dr. Bilbrey is not a treating source because he saw the plaintiff on only one occasion for the purpose of a consultative examination. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and

---

[10] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 416.902). Consequently, the treating physician rule does not apply, and the ALJ was only required to consider the evidence from Dr. Bilbrey in accordance with 20 C.F.R. § 416.927(c). The ALJ thoroughly considered Dr. Bilbrey's findings, noting that his assessment was "based . . . on psychological testing, a clinical interview, and observations" and that his "examination was thorough and consistent with the evidence." (Tr. 25-26.) The ALJ in fact gave Dr. Bilbrey's opinion "some weight" and specifically included limitations in the plaintiff's RFC based on Dr. Bilbrey's assessment.[11] (Tr. 22, 26.)

The plaintiff argues that the VE testified that he "would be unable to work given Dr. Bilbrey's restrictions." Docket Entry No. 16, at 14. The plaintiff bases this conclusion on the VE's testimony that a person would be unable to work if he were "seriously limited but not precluded" in the areas of "relating to co-workers, dealing with the public, interacting with supervisors, dealing with job stress, [and] functioning independently." (Tr. 53-54.) These limitations correspond with Dr. Bilbrey's assessment that the plaintiff had "fair" abilities in these areas. (Tr. 326.) The ALJ, however, did not give controlling weight or otherwise adopt Dr. Bilbrey's opinion in total. Consequently, the ALJ was not required to include all of Dr. Bilbrey's limitations in the plaintiff's RFC. The ALJ clearly based the plaintiff's RFC on the first hypothetical question, which incorporated some but not all of Dr. Bilbrey's limitations, and the VE testified that

---

[11] The ALJ indicated that he limited the plaintiff to following simple instructions, adapting to occasional changes, and completing tasks requiring no more than second grade reading skills based in part on Dr. Bilbrey's assessment. (Tr. 26.)

a person with these limitations would be able to work.  (Tr. 22, 52-53.)  The Court concludes that the ALJ appropriately considered and incorporated Dr. Bilbrey's assessment.

The plaintiff also argues that treatment notes and GAF scores during his time at Plateau show that he has "moderate to severe impairments in psychological functioning."  Docket Entry No. 16, at 14.  The plaintiff's treatment records at Plateau show that he was regularly assigned GAF scores between 50 and 55.  (Tr. 217, 220, 222, 224, 249, 252, 297, 300, 305, 311, 315.)  A GAF score between 41-50 "reflects the assessor's opinion that the subject has serious symptoms or serious impairment of social or occupational functioning," *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. 2006), while a GAF score between 51-60 reflects "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning."  DSM-IV-TR at 34.  In *Bratton v. Astrue*, 2010 WL 2901856, at *8 (M.D. Tenn. July 19, 2010) (Nixon, J.), this Court noted that:

> A GAF score can be helpful in assessing an individual's mental RFC.  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. 2006).  At the same time, the Sixth Circuit recognizes that a GAF score is a physician's subjective evaluation and not raw medical data.  *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007).  The Commissioner explicitly denies endorsing use of the GAF scale in Social Security disability programs, and states that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings."  65 Fed. Reg. 50,745, 50,764-765 (Aug. 21, 2000); *see also Kennedy*, 247 Fed. Appx. at 766; *DeBoard v. Comm'r Soc. Sec.*, 211 Fed. Appx. 411 (6th Cir. 2006).

*Bratton*, 2010 WL 2901856, at *8.  As the Sixth Circuit has pointed out, there is no "statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place," *Kornecky*, 167 Fed. Appx. at 511, and "[a] GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681, 684 (6th Cir. Mar. 17, 2011).  However, although a GAF score is not dispositive in determining an individual's mental RFC, it can be one

of several factors weighed or considered in assessing an individual's mental RFC, *see Kornecky*, 167 Fed. Appx. at 503 n.7, and it can be useful in evaluating the consistency of a physician's treatment notes and opinions. *Bratton*, 2010 WL 2901856, at *8.

The ALJ addressed the plaintiff's treatment history at Plateau, including his GAF scores, in some detail. (Tr. 24-26.) While acknowledging that the plaintiff was often assigned a GAF score of 50, the ALJ also noted that the plaintiff frequently reported that his symptoms were stable with medication. (Tr. 24.) Additionally, the ALJ noted that the plaintiff was often noncompliant with scheduled appointments, finding "[t]he frequency of these missed appointments . . . troublesome." *Id.* The ALJ also observed that at the plaintiff's most recent treatment visit at Plateau in January 2010, he was assigned a GAF score of 55, indicating only moderate symptoms.[12] (Tr. 25, 311, 315.) The ALJ did not specifically discredit the plaintiff's GAF scores at Plateau, nor was he required to do so. *See Kornecky*, 167 Fed. Appx. at 511. In fact, the ALJ included limitations in the plaintiff's RFC based upon his treatment history at Plateau. When restricting the plaintiff from "jobs that require contact with the general public," the ALJ specifically gave "great weight" to treatment notes from Plateau indicating that the plaintiff "would be a good candidate for work outside of the public eye." (Tr. 26, 296, 301.) The Court concludes that the ALJ appropriately considered the medical evidence from Plateau.

---

[12] The ALJ also noted that Dr. Bilbrey assigned the plaintiff a GAF score of 58 in February 2010. (Tr. 25, 320.)

## IV.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 15) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


JULIET GRIFFIN
United States Magistrate Judge